And we have Rosemarie Vargas versus Facebook. So we'll start with the first case, which is Ramirez-Zepeda. And Mr. Carter, I believe you said you can hear us OK? I can. Can you hear me? Yeah, we can. And you may start when you are ready. Thank you, and good morning to the court. May it please the court and counsel. This is an asylum withholding and cat denial that is on appeal before this court. The facts involve Ms. Ramirez-Zepeda, a 38-year-old sixth grade elementary school teacher from Honduras. She fled Honduras in February of 2015 because she feared for her life after a family feud devolved into a violent two-year campaign of terror against her and her own family. It perhaps went back to 1980, when the same other branch of family allegedly killed her own father. But it really didn't come to a head until 2013, when she was accosted in her own yard by the wife of her cousin. Her testimony was fully credited by the immigration judge and the board, as was her evidence. Her siblings and her own daughter have now been persecuted since 2013, as has a pastor who offered her refuge six hours away from where the bulk of the persecution initially occurred. He, too, has now been threatened, and actually was threatened while she was living with him in refuge. The same branch of the family threatened to blow up his home, and that's when she decided to leave to the United States. The errors of law that we allege center on the cognizability of a social group proffered by Ms. Ramirez-Cepeda. Her proffered social group, at the conclusion of evidence, when asked by the immigration judge, was it is a family member who has been persecuted in the past over these territorial money issues, alluding to the original persecution and killing of her own father. However, in her affidavit and in her testimony, she also alluded to the fact that the real problems began when she called the police after she was attacked by her cousin in the family yard when she was showering in the outdoor shower. She called the police. The police came. They arrested a woman named Carmela. And that's when the problems really began, because Carmela's own children began persecuting her as well. The cognizability issue centers around this court's decision in Diaz-Reynoso, in which it said that many courts, including the board, have misinterpreted matter AB to have a per se rule against mentioning harm in the definition of a social group. As you know, this court held that that's not so. There is no per se rule. It's more of a holistic approach of analyzing all of the factors in the case to determine whether a social group had been established. So the matter should be remanded for that matter, for that reason alone. There is no per se rule against mentioning. I have a question about nexus. I guess my issue is whether the harm occurred or whether the petitioner is being targeted because of her membership in her family, that is her relationship to the father, or whether instead it is because she called the police on Carmela, which if Carmela had just been a total stranger and not a cousin, wouldn't necessarily be nexus to a protected group. So would you help me with the nexus part of this? Sure. So because there's some ambiguity in the social group itself, which is really the infirmity of the agency's decisions, we're left in a little bit of a difficult spot in that regard. But even if the attacks from 2013 forward were because of the shower incident and not because of the inheritance incident in 1980, it's still based on her family social group because they've very clearly targeted only her family, have threatened only her family, have threatened her children, and threatened her. So I think the family group as a social group still could work if it's remanded, certainly, even if the IJ found that she was attacked for other reasons apart from the inheritance. Her testimony also included the fact that Carmela's own children attended the school at which she taught. And therefore, she learned about the relationship through that commonality. And so I think there is a nexus pretty clearly there as well. There might be a couple of different motives by the persecutors, but that shouldn't be this court's concern, I don't think. I think the court's concern ought to be whether or not her family was targeted. I think it clearly was, regardless of the motivations. Do we consider the concept of nexus in this context? In a similar way, do we do causation in other contexts? So the question is whether or not it was a contributing cause rather than the primary cause? It has to be one central cause. We know that. It has to be one central reason, the family inclusion. We know that from the REAL ID Act. And I think clearly it was, whether or not it was because of the original family dispute in 1980, or whether it was because she had called the police on Carmela and her entire family was targeted as a result anyway, or both. I think she can prevail either way. But I think clearly the social group needs to be clarified and dealt with in light of Diaz-Reynoso, and that's why we're asking for a remit. Well, but Judge Graber's question is not so much on the group. It's on the nexus issue. And in fact, didn't the IJ say that it appeared to be a vendetta rather than related to the family inheritance issue? Yeah, I believe the IJ did say that, Your Honor. Well, does that resolve the question on a substantial evidence basis? No, I don't think so. I don't think it does because, first of all, there was never a mention of money. There was never a request for money. They didn't swing machetes at her head and beat her with rocks and throw rocks at her home and chase her into her school while saying, you owe us money from the inheritance. Instead, they said, we're going to kill you because you locked up my mom, right? And so I think that, go ahead. That's Judge Graber's point. Yeah. So I don't think that if the nexus, if the reason for the persecution was the incident in the shower and had nothing to do with the inheritance, I don't think that would be preemptive of relief here anyway because it would still be based on the fact that she was a member of that family. And the persecution that she suffered was likely a result of that after they learned that she was affiliated with the same family headed by the person who was killed in 1980. So I think it all ties together in a fashion because it's all the same family. And one, I think the IJ's error, the IJ didn't rule that there was no nexus because I just lost my thought. I think the IJ didn't rule there was a lack of nexus because of the shower incident. The IJ actually alluded to the inheritance issue. I think the IJ's ruling that there was no nexus was predicated on the fact that there was no cognizable social group in the first instance, so there couldn't be a nexus. Except that we're reviewing the BIA's decision, which is somewhat different in terms of nexus. They said that the harm stemmed from a personal vendetta, not due to respondents' membership in a particular social group, which in the previous paragraph they had talked about being her family. So I think one way of approaching the nexus issue is to inquire, well, why would you target a family? And I think the answer is, it is a vendetta. And that's the whole point of persecuting a family. It's meant to exacerbate and cause harm and fear and exact retribution. That's exactly the point. And that's why it's a quintessential social group. That's why what I'm troubled about is that there seems to be some support in the record for the idea that the vendetta stemmed from sending Carmela to jail and not necessarily for any other reason. And if you're targeted because you ratted on somebody, I'm not sure that that's a protected ground. And I would answer Your Honor's point by saying that woven throughout the testimony and woven throughout the evidence is this notion that it began with her father's murder. Even in a different police report for persecution of a different family member, that same event in 1980 is mentioned in that breath. And so I think it's pretty clear that that's what kicked all of this off. Whether the shower incident was directly related to that or whether it became intertwined at a later time, I can't say, and I don't know that anybody could, but certainly all of the instances that happened with a machete, with the threatened bombing, with chasing her into a school, all of those horrible, with threatening her daughter, all of those horrible incidences happened after they knew that she was the daughter of the person killed, certainly. So there's a couple other errors of law that we allege. And one is that there was no past persecution. We strongly disagree with that. The IJ and board devoted one line to that conclusion without talking about any of the incidences that happened. So maybe that was because they didn't discern a cognizable social group, so therefore there can't be past persecution because past persecution must be predicated on a cognizable social group. I don't know, but they didn't analyze the facts. And we believe that these horrendous acts by that branch of the family do in fact constitute past persecution. And last, the error of law. Well, I think that gets us to a remand, certainly, but I think there's also problems with the IJ and board's argument that internal relocation was possible when she had moved six hours away to reside with the pastor. That didn't work out. They found her there. Yes, there was family in the same neighborhood as that, but the evidence shows that Honduras is roughly slightly less than half the size of Utah. It's a small state. Hard to get around because it's very undeveloped, but the evidence shows that there's nowhere in that country that she's gonna be able to go to escape the violence. All right, and for all of these reasons, for all of these reasons, we ask for a remand. Thank you, counsel. I'll give you one minute for rebuttal, okay? Very good, thank you. Thanks. May it please the court. My name is Robert Coleman, and I represent the attorney general. As to the issue of nexus, the decision by the agency in finding that there was no nexus was premised on the fact that there is simply no evidence in the record that the attacks launched against Ramirez had anything to do with her membership in the proposed particular social group. Except that the initial attack happened when the attacker realized who the petitioner was, that she was related to the father and the inheritance and the whole family drama with the two sides of the family fighting each other, that it wasn't robbery or some other just random act. That initial targeting was because of her membership in the family, that is, she was her father's daughter. Isn't that what the record would show? Respectfully, no, Your Honor. The record does not show that that was the motivation because the initial incident with the father was years before. No, no, I mean the initial incident with the petitioner, not with the father. I mean, they didn't attack her till they figured out who she was, right? Right, but there's no evidence in the record to link those two factors. So I do believe that Ramirez did indicate that she believed that through her new job that Carmela and her family knew who she was, but there's no evidence to indicate that the initial attack was motivated by that. And in fact, in the affidavit that Ramirez filed, which is at pages 292 and 293 of the record, Ramirez indicated that the initial misunderstanding that resulted in the initial attack actually had to do with Angela, who was Carmela's daughter, misunderstanding Ramirez and thinking that she was insulted by Ramirez. And that that- Mr. Coleman, my looking at the record that was cited by the BIA on this issue, indicates the BIA cites the three pages in the transcript of the immigration hearing in which Ramirez testified, you know, their extended family's anger over her father's inheritance, and their fear that Ramirez and her siblings would avenge the father's murder, and the continuing problems that the family, that is Ramirez and her siblings, had. Now, given that citation, isn't that a suggestion that the BIA was focusing on the historical problems between these two branches of the family, rather than some vendetta against this misery of Ramirez? What do you have to say to that? The board, after its review of the record, ultimately concluded that there was simply no nexus between the attack and the proposed membership. So that the board reviewed what Ramirez had claimed during the merits hearing does not mean that that had to be deemed to be the facts of the case. That's not my question. My question is, they cited three pages from the immigration hearing testimony that talked about this family dispute. Yes, and concluded that- My question is, doesn't that mean that their focus was on the family dispute, not a particular vendetta against Ms. Ramirez alone? That's correct, because that's what the proposed social group was. It was family members who were persecuted in the past over territorial and money disputes, and it's only territorial and money disputes that are relevant to this case. You need to address my point, not around my point. My point is, when the BIA spoke about, said her harm stemmed from personal vendetta, the three pages they cite are about the historical feud between these two branches of the family due to the inheritance. Now, doesn't that suggest that that was the basis for the attack or for the problems? I don't believe so, and the reason why I'm saying that is because I don't understand how the board could have reached that conclusion if we assumed that the board was focused in the manner that you're indicating. So, the board ultimately... So, if the board was... So, in the board being focused on the personal vendetta, I believe that the board simply concluded that the evidence regarding the personal vendetta simply did not show a link between the attacks and the proposed membership and the proposed social group. That was the conclusion of the board. So, if they cited evidence that doesn't seem to support that conclusion, I think that that stands for the proposition that they rejected the evidence that was put forth by Ramirez on that point, or they just simply didn't buy the theory of the case put forward by Ramirez or concluded that the evidence simply didn't support it. And that's for good reason here, because we have no harm done to Ramirez until we have this incident in the shower, which started from this misunderstanding. Which happened when they figured out that she was related to her father. That's my problem with your part of the argument, I guess. Ramirez says that it started because of a perceived insult, which is at pages 292 and 293 in her affidavit. So, that does not show a link between finding out that she was a member of the family. That could have been coincidental, or they may have known that previously, because Ramirez did indicate that they were family, they knew of each other, although they had not had a close relationship. And all of the further misconduct against Ramirez stems from that initial point. And the children, the sons of Carmela, the initial attacker, as well as Carmela's nephew, both referred to Carmela's being imprisoned as their motivation, and they both indicated that they would harm Ramirez now, or that Ramirez was their enemy from now on, which indicates that they had no animus beforehand, and that all of the animus is stemming from this initial jailing, which is simply inconsistent with the notion that they had this longstanding family vendetta that had simply sprung forth because they found out who Ramirez was, that they would not have put their threats in those words. And the lack of nexus here can be seen most clearly in comparing this court's decision in CORE, K-A-U-R-V Garland, where there was a family relationship and the purported persecutor in that situation referenced the family relationship, referred in the threats that were rendered against the petitioner, referred to the purported persecutor, that is, referred to the petitioner as being a bad wife and insufficiently loyal to the family, indicative statements like that that could inform a decision as to what the motivation was. Here, not only do we have an absence of evidence pointing toward the family membership as the motivation, but we also have this affirmative evidence. We have the petitioner's testimony, and she was not, there's no adverse credibility finding, correct? Correct, but even crediting her testimony, there still is this misunderstanding at the shower that instigates everything. And so- Doesn't Cower say that you can't let something like that overwhelm the evidence? You have to look at it in a holistic fashion. That's correct. But this court also said in CORE that the family membership cannot be minor. And here, it's not minor. There simply is no actual evidence that the persecutors were motivated by the family connection. That could be purely coincidental here. We have, what we do have is- Except even the IJ found that it was related to the inheritance, which has to do with a family passing property to another part of the family, and there's evidence that these two parts of the family do not get along. Well, that is correct. But that immigration judge noted that, at best, it could be found to be related to this old vendetta, but then also said it could be ascribed to simply criminal conditions in Honduras or a purely personal vendetta, and simply concluded that there was no evidence of nexus here. Anything further, Judge Graham? No. Okay, thank you very much. Thank you. Mr. Carpenter, one minute. Thank you. So I think it's important to not focus just on the shower, because although that was the initial incident, there were five or six others, well, many others, because they happen on a daily basis after that fact. So what was said during that exchange and what was said before the exchange erupted into a beating and a picking up of a rock to smash her head with before she was stopped shouldn't be the end of the case. There were many more aggressive steps taken in this terror campaign by that branch of the family against her. So that would be the first observation I would make. Second, I would disagree with the government's position that the board made it a centerpiece that nexus was important. It didn't, it wasn't. The board spent the first three paragraphs of its substantive decision talking about cognizability and the inclusion of harm in the title, in the social group. So I think that's very problematic, but nexus was addressed by one sentence, one sentence short of ending that part of the board's decision. So, you know, not finding a nexus where the board has already found that the group doesn't exist is not terribly persuasive. Thank you. Thank you very much. Thank you both, counsel, for your briefing and argument in this case. This matter is submitted.
judges: Murphy, GRABER, OWENS